UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CHARLES RANDALL HARRISON,      )
                                )
        PETITIONER,             )
                                )   CASE NO: 05-40021-MLW
    -VS-                         )
                                )
DAVID L. WINN, WARDEN,          )
                                )
        RESPONDENT.             )

## AMENDED COMPLAINT

Comes now petitioner, Charles Randall Harrison, hereinafter known as (petitioner), acting in propria persona, and in want of counsel, and would aver as follows.

### STATEMENT OF CASE

On October 1, 1996, petitioner was charged by a grand jury in the Northern District of Florida to a five (5) count second superceding indictment. Petitioner was charged in Count I with conspiracy to possess with intent to distribute Methamphetamine in violation of 21 U.S.C. §841 (a) (1), (b) (1) (A) (VIII) and Amphetamine §841 (b) (D). See (exhibit "A").

1.   CONSPIRACY

To successfully prosecute conspiracy, government must be able to point to two (2) separate provisions, one making act of conspiracy a crime, and one making object of conspiracy a crime. U.S.C.A. Const. Amendment 5; Comprehensive Drug Abuse Prevention and Control Act, of 1970, §§406, 1013, 21 U.S.C. §§846, 963. 21 U.S.C. §846, states: Any person who attempts conspires to commit any offense defined in this Title is punishable by imprisonment or fine or both for the offense.

This Title as used in §846 refers to the Controlled Substance Act. The provision making the act of conspiracy unlawful is 21 U.S.C. §841 (a) (1); the unlawful act.

The "object" offenses for conspiracy are well defined in the U.S.S.G. at 2D1.1 at page 93 of the 1998-99 edition of the U.S.S.G. for attempts or conspiracy. Which states: "If the defendant is convicted under 21 U.S.C. §841 (b) (1) (A), (b) (1) (B), or (b) (1) (C)." It should be noticed that (b) (1) (D) is not listed.

2. Petitioner's Indictment was Jurisdictionally Defective for the following Reasons

Petitioner's indictment charged him in Count I and Count II for possessing with intent to distribute Amphetamine as an "object" offense and charged §841 (b) (D) a non-existent statute. See (exhibit "3"). Furthermore, Count I and Count II failed to charge the operative part of the statute 21 U.S.C. §841 (a) (1) for the Amphetamine object-offense.

3. Congress Expressly Incorporated the "Object" of the Conspiracy into the definition of §846

These provisions allow imposition of prison terms and fines equal to those that can be imposed for the commission of the crimes that were the "objects" of the attempt or conspiracy.

Congress expressly incorporated the "object" of the conspiracy into the definition of §846 and the violation necessarily "must" specify the threshhold facts to identify the statutory penalty range under §841.

4.  The Indictment in Count I and Count II was
    Jurisdictionally Defective for the following Reasons

The government in Count I properly charged the Methamphetamine object of the conspiracy naming the <u>Title</u> and penalty provision of 21 U.S.C. §841 (b) (1) (A) (VIII) which makes the object of the conspiracy for the Methamphetamine, but in charging the Amphetamine object of the conspiracy in Count I the indictment charged a non-existent statute §841 (b) (D), that the judge in petitioner's trail said did not exist. See (exhibit "B").

5.  The District Court Constructively Amended Petitioner's
    Indictment during the trial and at Sentencing

The District Court Judge after jury selection and opening statements stopped petitioner's trial when he noticed what he called a serious problem. See (exhibit "B"). <u>at</u> line 19-20. The judge tried to limit this error to only Count II but Count I charged the same non-existent statute §841 (b) (D). The District Court Judge then constructively amended petitioner's indictment when he charged the penalty section from §841 (b) (D) to §841 (b) (1) (D). See (exhibit "B"). Constructive Amendment No: 1.

The indictment was amended again at sentencing by the probation officer and later by the judge when he adopted the report by changing the penalty section from §841 (b) (1) (D) to §841 (b) (1) (C). See P.S.I. at ¶93 (exhibit "C").

Therefore, petitioner's indictment was jurisdictionally defective for failure to properly charge the Amphetamine object-offense in Count I and in Count II.

-3-

The language in the indictment nor the statutory citation did not properly charge an offense.

6.    The District Court was Without Jurisdiction to
       act because Petitioner was Charged to a non-offense

Petitioner is aware that district courts of the Federal United States have original and exclusive jurisdiction, 18 U.S.C. §3231. Despite this broad grant of power the old Fifth Circuit in **United States -vs- Meachum, 626 F. 2d 503 (5th**

Fifth Circuit in **United States -vs- Meachum, 626 F. 2d 503 (5th Cir. 1980);** stated:    that a district court is without jurisdiction to act when a defendant is indicted to a non-offense.    The Supreme Courts decision *in* **United States -vs- Cotton, 152 L. Ed. 2d 860 (2002)** did not overrule this decision.    See **United States -vs- Peter, 310 F. 3d 709 (11th Cir. 2002).**

7.    The Indictment was also Broadened outside the four
       Corners found by the Grand Jury

The nature of the conspiracy alleged is determined from an examination of the four corners of the indictment. The precise manner in which an indictment is drawn cannot be ignored; because an important function of the indictment is to ensure that, in case any proceedings are taken against the (defendant) for a similar offense...the record [will] sho[w] with accuracy to what extent he may plead former acquital or conviction.    **Sanabria -vs United States, 437 U.S. 54, 65-66 (1978).**

The government in this case, chose to seek a grand jury indictment naming two specific controlled substances as the "objects" of the conspiracy in a single Count of the indictment in Count I.

The government therefore cannot defend the conviction and sentence imposed on the grounds that the jury found a broader different conspiracy to distribute controlled substances generally. **Stirone -vs- States, 361 U.S. 212, 218 (1960).**

The government through its ability to craft indictments is the master of the charged conspiracy...having set the stage, the government must be satisfied with the limits of its own creation. **United States -vs- Neopolitan, 791 F. 2d 480, 501 (7th Cir. 1986); United States -vs- Weismann, 899 F. 2d 1111, 1115 (11th Cir. 1990).**

8.  Count II of Petitioner's Indictment was also Jurisdictionally Defective

Count II in petitioner's indictment also charged a non-offense. See (exhibit "A" and "B").

The judge in petitioner's trial after jury selection and opening statements stopped the proceedings when he discovered, what he called a "serious problem" in petitioner's indictment. See (exhibit "B") line 20.  The court stated:  "Well the problem is it seems to have charged some strange section of Title 21, but not the one that seems to be the operative one." First of all section §841 (b) (D) "doesn't exist." Constructive Amendment No: 1.  The case should have been continued and the indictment corrected and sent back to the grand jury for further deliberation.  The judge also tried to limit this error to Count II only, when in fact petitioner was charged to the same "non-existent" statute §841 (b) (D) in Count I for the Amphetamine object of the conspiracy.  See (exhibit "A").

-5-

9.   The Government was sloppy in the Crafting of the
     Indictment against Petitioner

     The government in crafting the indictment failed to charge

the "actus reus" element of the offense, which is the wrongful

deed or the unlawful act, the operative section of the statute

§841 (a) (1) sets forth the "mens rea" element of the statute

which   knowingly   and   intentionally   possessing   the   named

controlled substance that was the object of the conspiracy to

distribute. It takes these two essential elements for every

crime at common law. It seems that the only remedy would be

dismissal of the indictment in this case, even though that

choice is not exactly the favorite dosage of medicine preferred

to be administered to the government, it is possibly the best

way to stop the unbridled carelessness of the U.S. Attorneys in

their construction of indictments and sloppy ways of dealing

with grand juries in this country.  The interest of the United

States in a criminal prosecution is not that it shall win the

case, but that justice will be done.  **Jencks -vs- U.S.**, 353

**U.S. 657, 1 L. Ed. 2d 1603, 77 S. Ct. 1007 (1957).**

10.  Indictment that Charges a Non-Offense has always
     been deemed Jurisdictional

     In making the requirement of an indictment jurisdictional,

Rule 7 (a) Fed. R. Crim. P. merely codifies what was always

considered to be the law.  Thus in **Ex Parte Wilson, 114 U.S.**

**417, 429, 5 S. Ct. 935, 941, 29 L. Ed. 849 (1887);** the court

stated:   "the district court in holding the petitioner to

answer for such a crime, without indictment or presentment by a

grand jury exceeded its jurisdiction and the defendant is

entitled to be discharged." See (exhibit "A" and "B").

-6-

A court can acquire no jurisdiction to try a person for a criminal offense, unless he has been charged with the commission of a 'particular' offense and charged in the 'particular' form and mode required by law. **Albrect -vs-United States, 336 U.S. 440 (1949).**

11. Petitioner's Jurisdictional Claim Should be
    Heard on its Merits

One type of claim that has historically been recognized as fundamental, and for which collateral relief has accordingly been available is that of "jurisdictional error." See: **United States -vs- Addonizio, 442 U.S. 178, 185, 99 S. Ct. 2235, 60 L. Ed. 2d 805 (1979)**; "Habeas Corpus has long been available to attack a conviction entered by a court without jurisdiction." **Keel -vs- United States, 585 F. 2d 110, 114 (5th Cir. 1978). (en banc)** "distinguishing challenge to conviction, vesting on guilty plea, Jurisdictional Errors from those which may be raised in collateral attack."

Since "jurisdictional" error implicates a court's power to adjudicate the matter before it, such power can never be waived by the parties to the litigation. See: **Louisville & Nashville Railroad Co. -vs- Mottley, 211 U.S. 149, 152, 29 S. Ct. 42, 53 L. Ed. 129 (1908).** "Ordering case dismissed for lack of jurisdiction despite absence of objection from either party to trial court's previous adjudication of merits."

12. The District Court "Trumped" the Statute
    §841 (b) (1) (D) with a Federal Regulation

Amphetamine is listed at Title 21 U.S.C. §812 at a schedule III controlled substance and falls under 21 U.S.C. §841 (b) (1) (D). The probation officer in her P.S.I. stated: that Amphetamine is a schedule II controlled substance by designation of the Attorney General by way of Federal Regulation. It is petitioner's proposition that it was the intent of the U.S. Attorney to indict petitioner for 21 U.S.C. §841 (b) (1) (D), seeing that Amphetamine is listed as a schedule III drug pursuant to Title 21 U.S.C. §812 Fed. R. Crim. Proc. See page 1156 of the 2001 Edition, and that is what the judge amended the indictment to in trial. See (exhibit "B").

Petitioner was tried and convicted pursuant to §841 (b) (1) (D). The district court judge in adopting the P.S.I. report over objection of petitioner pro-se, overrode the statute §841 (b) (1) (D) with a Federal Regulation. Also, more fundamentally, it is axiomatic that federal regulations cannot "trump or repeal" acts of Congress. **Aerolineas Argentinas -vs- United States, 77 F. 3d 1564 (Fed. Cir. 1996).** "A regulation cannot override a clearly statutory enactment and federal regulations cannot "trump" or "repeal" acts of Congress." **United States -vs- Kirvan, 86 F. 3d 309 (2nd Cir. 1996).**

13. The Prosecutor knowingly and Intentionally Presented
    False Material Evidence and Perjured Testimony which
    was Material to the Grand Jury in Presentment of
    Petitioner's Case

-8-

1996
On August 20, 2006, A.U.S.A. Attorney Edwin F. Knight and his grand jury and trial witness D.E.A. Special Agent Charles Gravat presented 1240 grams of a tan powered substance to the grand jury for the Northern District of Florida. This tan substance was confiscated from the government's "star witness" at his arrest on August 16, 1996. Mr. Knight and D.E.A. Special Agent Charles Gravat presented this tan substance to the grand jury and told them that the substance was Methamphetamine a total of sixteen times. See (August 20, 1996 grand jury minutes).

August 20, 1996, the very same day, A.U.S.A. Edwin F. Knight, received a report from the government's expert witness and Forensic Scientist, Mrs. Ivette Vallego who determined the tan substance to be a completely different drug not Methamphetamine. The substance tested to be 100% DL Amphetamine. See (exhibit "D").

14. Petitioner was entitled to an Impartial and Unbiased Prosecutor in his Trial

Petitioner states: "that the A.U.S.A. Edwin F. Knight and Special Agent Charles Gravat developed a personal bias toward petitioner because he would not cooperate with the government. Petitioner received threats from D.E.A. Special Agent Gravat that he would see to it that petitioner received thirty-years if he did not help him on this case. See: **Young -vs- United States, 481 U.S. 787, 95 L. Ed. 2d 740, 107 S. Ct. 2124, (1987).**

-9-

At this point in which A.U.S.A. Edwin F. Knight, became aware that both he and Special Agent Gravat had presented material false information, and perjured testimony that was material to the grand jury, the prosecutor Edwin F. Knight was under a duty to immediately inform the court and opposing counsel...and because both he and Agent Gravat had presented false material information and perjured testimony and both were material, to inform the grand jury in order that appropriate action might have been taken. **United States -vs- Basurto, 497 F. 2d at 785 (1974).**

Significantly, the A.U.S.A. instead of informing the court and other parties, and correct this cancer to justice, Mr. Knight did nothing and permitted petitioner to stand trial on an indictment that was based on false material information and perjured testimony and allowed the cancer to grow.

To demonstrate that the A.U.S.A. did this intentionally and maliciously, on September 17, 1996, A.U.S.A. Knight and Special Agent Gravat went back before the grand jury with the same 1240 grams of Amphetamine and presented it to the grand jury as Methamphetamine. See: (exhibit "E") at (page 3).

It should be noted that petitioner's original and the superceding indictments were for Methamphetamine only. The A.U.S.A. Edwin F. Knight and Special Agent Gravat on October 1, 1996 took this same 1240 grams of Amphetamine and presented it to the grand jury in its true substance as Amphetamine and got a second superceding indictment and broadened and substantially amended the original charge.

-10-

By adding Amphetamine as a "object" offense in the conspiracy
Count I and Count II of Possession with Intent to distribute
Amphetamine.  **United States -vs- Italiano, 894 F. 2d 1280,
(11th Cir.  1990).** See also:  **United States -vs- Elliot, 849
F. 2d 554, (11th Cir. 1988).**

Agent Gravat testified before the grand jury and in trial,
that in the last ninety days before Keary Owens arrest on
August 16, 1996, that three controlled buys of Methamphetamine
had been purchased from the government's "star witness."  This
was another act of blatant perjury that was knowingly and
intentional. A.U.S.A. had in his possession the lab reports on
these three controlled buys that revealed the substance to be
once again DL Amphetamine.  These reports were done by Forensic
Scientist Marc Crews, and the A.U.S.A. knew that Agent Gravat
was lying but again did nothing.

While these cases cited by the petitioner, may not exactly
parallel the facts of the instant case, but their rulings the
consequences of a violation or an abuse of this prosecutorial
"duty" "must" be applied where the prosecutor has knowledge
that the testimony before the grand jury was false and
perjured. **Mooney -vs- Holoham, 294 U.S. 103, 55 S. Ct. 340, 79
L. Ed. 2d 791, (1935).  Giles -vs- Maryland, 386 U.S. 66, 87 S.
Ct. 793, L. Ed. 2d 737, (1967).  Napue -vs- Illinois, 360 U.S.
264, 79 S. Ct. 1173, 3 L. Ed. 1217 (1959); Alcorta -vs- Texas,
355 U.S. 28, 78 S. Ct. 103, 2 L. Ed. 9 (1957); Hysler -vs-
Florida, 315 U.S. 411, 62 S. Ct. 688, 86 L. Ed. 392 (1942);
Pyle -vs- Kansas, 317 U.S. 213, 63 S. Ct. 177, 87 L. Ed. 214,
(1942).**

15.  Dismissal of the Prosecution in this Case is
     Warranted due to "outrageous" Misconduct by
     Prosecutor and D.E.A. in this Case

     Petitioner states that due to the "outrageous" misconduct

by the prosecution and the D.E.A. in the investigation and the

presentment of this case as noted above supra, the prosecution

in this case should have been dismissed.  The argument is based

on language in Mr. Justice Powells concurring opinion in

**Hampton -vs- United States, 425 U.S. 484, 491-95, 96 S. Ct.**

**1646, 1650-53, 48 L. Ed. 2d 113 (1976)** "indicating the

'outrageous' conduct by government agents investigating a case

may warrant dismissal of a prosecution."

16.  Deceptive Manipulation of the Evidence and Facts
     Deprived Petitioner of his Constitutional Right to
     a Fair Trial

     This deceptive manipulation of the evidence and the facts

by the prosecution and D.E.A. in this case deprived petitioner

of a fair trial.  Because the government's failure of proof

as to either Methamphetamine and Amphetamine, would have

required an acquittal on Count I and the conspiracy charge.

See:  **United States -vs- Allen, 302 F. 3d at 1260.**  The

government cannot produce one gram of Methamphetamine in his

trial nor at sentencing, nor from circumstantial evidence that

petitioner or any of his co-defendants ever possessed any

Methamphetamine.  Therefore, petitioner is "actually innocent"

of the conspiracy Count I.

17.  The Judges Refusal to Instruct the Jury and
     give them guidance on a question of Law was
     Intrinsically Harmful Structural Error

-12-

At the liability portion of petitioner's trial, during the jury deliberations, the jury sent a question to Judge Vinson asking for guidance on an important issue of law. The question read: "What quantity or drug amount is considered an amount for personal use or possession $Or$ an amount for distribution?" The court stated for the record: "There is no legal definition for that and it is a matter for you to decide." See (exhibit "F").

Petitioner was entitled to a lessor included offense instruction. See: U.S. -vs- Monger, 185 F. 3d (6th Cir. 1999). Petitioner had admitted at trial that the 4.9 grams of Amphetamine confiscated at his arrest was his for "personal use."

The 4.9 grams was in one (1) container and there were no scales or cutting agents found in the search of petitioner's residence.

It is petitioner's proposition that Judge Roger Vinson abused his discreation for his failure to instruct the jury on the "entire offense" of simple possession. Unlike **Neder** 119 S. Ct. at 1833, petitioner was denied his constitutional right to a fair trial. Instead of omitting one element of the offense as in **Neder,** the district court in this case refused to instruct the jury on the entire offense of "simple possession." See: **Monger,** 185 F. 3d at 578 (6th Cir. 1999).

Petitioner was entitled to a lesser included offense instruction. **Monger,** 185 F. 3d 574 (6th Cir. 1999).

-13-

The district court's failure to instruct on the lesser included offense was intrinsically harmful structural error which mandates a new trial. Errors of this type are so intrinsically harmful as to require "automatic reversal" (i.e. "affect substantial rights"), without regards to their outcome. See: **Sullivan -vs- Louisianna, 124 L. Ed. 2d 182 (1993).** "holding a defective reasonable doubt instruction is not subject to harmless error analysis because it violates all the jury's findings." Such error "infects" the entire trial process, and necessarily renders a trial fundamentally unfair. **Neder, 119 S. Ct. at** 1833 (internal citations omitted).

In addition to the foregoing, the error, is a "watershed" rule and structural error itself cannot be barred. In **France -vs- Franklin, 85 L. Ed. 2d 344,** the Supreme Court stated: Headnote 2 (a); 2 b

"Due process prohibits the use of evidentiary presumptions in a jury charge that have the effect of releaving the [prosecutors] of the burden of proof."

In the instant case, not only was "presumption" instructed that there existed a conspiracy, that the jury could find guilt without entertaining any type of controlled substance, or amount thereof.

The bottom line is set forth in **Lambrix -vs- Singletary, 137 L. Ed. 2d 771,** "the court must survey the legal landscape and determine whether a court considering the defendant's claim at the time his conviction became final [would] have felt compelled by existing precedent to conclude that the claim he seeks was required by the constitution."

-14-

See also **Grahmn -vs- Collins, 122 L. Ed. 2d 260**, and **Saffle -vs- Parks, 108 L. Ed. 2d 415.**

18.  The A.E.D.P.A. does not Apply to a Petition under
     the Traditional Habeas Statute 28 U.S.C. §2241

There should no limitation to this petition pursuant to A.E.D.P.A. The A.E.D.P.A. applies to petitions brought under the post-conviction statutes §2254 and §2255, but not under the traditional habeas statute 28 U.S.C. §2241. See **Pub. Law. No: 104-132, 110 stat. 1214 (1996)**. A.E.D.P.A.'s gatekeeping provisions apply only to "second or successive" petitions within the meaning of 28 U.S.C. §2244. **James -vs- Walsh, 308 F. 3d at 166-67 (2nd Cir. 2002).**

This is petitioner's first attempt to file a traditional habeas petition. Courts have uniformly rejected a literal reading of Section 2244, concluding that a numerically second petition does not necessarily constitute a "second" petition for the purposes of A.E.D.P.A. See: **United States -vs- Barrett, 178 F. 3d 34, 42-44 (1st Cir. 1999).** To interpret the term "second or successive" courts look to Pre-A.E.D.P.A. abuse-of-the-writ-doctrine. See **Martinez -vs- Villareal, 523 U.S. at 643-45, 118 S. Ct. 1618. Muniz -vs- United States, 236 F. 3d 122, 127 (2nd Cir. 2001) (per curiam)**; "We...answer the question of whether a petition is 'second or successive' with reference to the equitable principals underlying the abuse of writ doctrine."

-15-

Section §2255 was never intended to supercede §2241 (c) (3). Significantly, §2255 as originally enacted and as amended by the A.E.D.P.A. contains an explicit exception to the general rule that a federal prisoner must use §2255 instead of seeking habeas relief under §2241 (c) (3). Petitioner is claiming his "actual innocence" of the charged offense and therefore fits within this "saving clause" exception.

Respectfully submitted,

Charles R. Harrison
#09856-002  Unit P-2
F.M.C. Devens
Post Office Box 879
Ayer, MA  01432-0879

-16-

(1)   PETITIONER PRESENTS HIS PETITION IN AFFIDAVIT FORM

(2)   I DO SWEAR AND AFFIRM UNDER THE PAINS AND PENALTIES OF PERJURY THAT THE FACTS AND ARGUMENTS PRESENTED IN MY AMENDED COMPLAINT ARE TRUE TO THE BEST OF MY KNOWLEDGE AND BELEIF.

(3)   I DO SWEAR AND AFFIRM THAT I AM THE PETITIONER IN THE INSTANT CASE.

(4)   I DO SWEAR AND AFFIRM THAT ALL OF THE ABOVE IS TRUE AS WELL AS THE FACTS PRESENTED IN MY AMENDED COMPLAINT UNDER THE PAINS AND PENALTIES OF PERJURY. SEE: 28 USC 1746

CHARLES RANDALL HARRISON
#09850-002    UNIT P-2
FMC DEVENS
P.O. BOX 879
AYER MA. 01432-0879

$(Exhibit\ A)$

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

UNITED STATES OF AMERICA

v.                     $9:16-57$

KEARY GLENN OWENS, $420\ 8C\ 5972$
SONYA MELISSA WILLIAMS, aka
    SONYA MORGAN,
CHARLES RANDALL HARRISON, aka RANDY,
and ROBERT HENLEY

_____/

**SECOND
SUPERSEDING
INDICTMENT**

$3:96cr57RV$

THE GRAND JURY CHARGES:

## COUNT I

That on or about January 1, 1994, and continuing through the date of the return of the indictment, in the Northern District of Florida and elsewhere, the defendants,

KEARY GLENN OWENS,
SONYA MELISSA WILLIAMS, aka
SONYA MORGAN,
CHARLES RANDALL HARRISON, aka RANDY, and
ROBERT HENLEY

did knowingly and willfully combine, conspire, confederate, agree, and have a tacit understanding with each other and other persons, to possess with intent to distribute the controlled substances methamphetamine and amphetamine, in violation of

OFFICE OF CLERK
U.S. DISTRICT CT.
NORTHERN DIST. FLA.
TALLAHASSEE, FLA.

96 OCT -3 AM 9: 45

FILED

1    MR. SPURLIN:  We join in that motion, Your Honor.

2         THE COURT:  As far as the evidence is concerned I

3    think there's more than sufficient evidence to get the case

4    to the jury on these two counts for both defendants.

5    I am concerned, however, with the charge in the second

6    superseding indictment on count two.  Mr. Patterson, are you

7    familiar with what I'm referring to?  Mr. Knight?

8         MR. PATTERSON:  I know the count.  I'm not sure I

9    know the problem.

10        THE COURT:  Well, the problem is it seems to have

11   charged some strange section of Title 21 but not the one that

12   seems to be the operative one.  Defense counsel, are you

13   aware of what I'm talking about?

14        MR. SPURLIN:  No, sir, Your Honor.

15        THE COURT:  First of all Section 841(b)(D) doesn't

16   exist.  It's 841(b)(1)(D) and that's the penalty section.

17   The section that's the operative part is 841(a)(1).  And it

18   doesn't seem to be charged.  Apparently I haven't noticed it

19   when I took pleas with the two codefendants either, but it

20   seems to be a serious problem.  We'll take that up in the

21   morning.

22   Other than that, as to the facts presented and the

23   evidence, sufficiency and all that, there's certainly grounds

24   to get the case to the jury.  So the motions are denied on

25   that but I'll take it under advisement with respect to count

(EXHIBIT R&R REPLY #11)



ALABAMA
## DEPARTMENT OF FORENSIC SCIENCES

SATELLITE LABORATORY
1478 HARTFORD HIGHWAY
DOTHAN, AL 36301
(334) 712-9742
FACSIMILE (334) 712-1918

MEDICAL EXAMINER
207 NORTH CHERRY STREET
DOTHAN, AL 36303
(334) 793-0615
FACSIMILE (334) 677-0322

CERTIFICATE OF ANALYSIS

Mike Gillis
ABC Board Narcotics Division
P. O. Box 531
Samson, AL    36477

CASE NUMBER: 96DD71608  SUBMITTING AGENCY CASE NUMBER: 961077L31E

| SUSPECT(S) | RACE | SEX | BIRTH DATE | STATUS |
|------------|------|-----|------------|--------|
| Keary Owens | W | M | 09/16/57 | Adult |

SERVICE REQUESTED:DRUG ANALYSES

CHAIN OF CUSTODY:

| RELINQUISHED BY | RECEIVED BY | DATE | TIME |
|-----------------|-------------|------|------|
| Mike Gillis | Marc Crews | 08/05/96 | 1320 |

DESCRIPTION OF EVIDENCE:

One sealed plastic bag containing one sandwich bag containing
a tan compressed material.

RESULTS OF ANALYSES:  DATE(S) OF ANALYSES: 08/05/96 - 08/22/96

Laboratory analyses of the compressed material revealed the
presence of dl-amphetamine.  dl-amphetamine is a Schedule II
controlled substance.  Weight in grams is 3.135.

Sworn to and subscribed before me this the 22nd day of August,
1996 as a true and correct copy.

Marc Crews
Forensic Scientist II
Analyst

JoAnn Prescott
Notary Public

(Exhibit A)

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

UNITED STATES OF AMERICA

v.                           9.16-57

KEARY GLENN OWENS, 420 82 5972
SONYA MELISSA WILLIAMS, aka
        SONYA MORGAN,
CHARLES RANDALL HARRISON, aka RANDY,
and ROBERT HENLEY

SECOND
SUPERSEDING
INDICTMENT

3:96cr57RV

_____/

THE GRAND JURY CHARGES:

### COUNT I

That on or about January 1, 1994, and continuing through the
date of the return of the indictment, in the Northern District of
Florida and elsewhere, the defendants,

KEARY GLENN OWENS,
SONYA MELISSA WILLIAMS, aka
SONYA MORGAN,
CHARLES RANDALL HARRISON, aka RANDY, and
ROBERT HENLEY

did knowingly and willfully combine, conspire, confederate,
agree, and have a tacit understanding with each other and other
persons, to possess with intent to distribute the controlled
substances methamphetamine and amphetamine, in violation of

OFFICE OF CLERK
U.S. DISTRICT CT.
NORTHERN DIST. FLA.
TALLAHASSEE, FLA.

96 OCT -3 AM 9: 45

FILED

Title 21, United States Code, Sections 841(a)(1), (b)(1)(A)(viii)
and 841(b)(D).

All in violation of Title 21, United States Code, Section
846.

COUNT II

That on or about August 16, 1996, in the Northern District
of Florida and elsewhere, the defendants,

KEARY GLENN OWENS and<br>
SONYA MELISSA WILLIAMS, aka<br>
SONYA MORGAN,<br>
CHARLES RANDALL HARRISON, aka RANDY, and<br>
ROBERT HENLEY

did knowingly and intentionally possess with intent to distribute
the controlled substance amphetamine, in violation of Title 21,
United States Code, Sections 841(b)(D) and 2.

COUNT III

That on or about August 16, 1996, in the Northern District
of Florida and elsewhere, the defendant,

KEARY GLENN OWENS,

did knowingly use and carry a firearm, to wit: a German make
Makarov-style pistol, during and in relation to a drug
trafficking crime for which he may be prosecuted in a court of
the United States, to wit: conspiracy to possess with intent to
distribute methamphetamine and amphetamine, and possession with
intent to distribute amphetamine, as charged in Counts I and II
of this indictment, in violation of Title 18, United States Code,
Section 924(c)(1).

2

| | |
|---|---|
| 1 | MR. SPURLIN: We join in that motion, Your Honor. |
| 2 | THE COURT: As far as the evidence is concerned I |
| 3 | think there's more than sufficient evidence to get the case |
| 4 | to the jury on these two counts for both defendants. |
| 5 | I am concerned, however, with the charge in the second |
| 6 | superseding indictment on count two. Mr. Patterson, are you |
| 7 | familiar with what I'm referring to? Mr. Knight? |
| 8 | MR. PATTERSON: I know the count. I'm not sure I |
| 9 | know the problem. |
| 10 | THE COURT: Well, the problem is it seems to have |
| 11 | charged some strange section of Title 21 but not the one that |
| 12 | seems to be the operative one. Defense counsel, are you |
| 13 | aware of what I'm talking about? |
| 14 | MR. SPURLIN: No, sir, Your Honor. |
| 15 | THE COURT: First of all Section 841(b)(D) doesn't |
| 16 | exist. It's 841(b)(1)(D) and that's the penalty section. |
| 17 | The section that's the operative part is 841(a)(1). And it |
| 18 | doesn't seem to be charged. Apparently I haven't noticed it |
| 19 | when I took pleas with the two codefendants either, but it |
| 20 | seems to be a serious problem. We'll take that up in the |
| 21 | morning. |
| 22 | Other than that, as to the facts presented and the |
| 23 | evidence, sufficiency and all that, there's certainly grounds |
| 24 | to get the case to the jury. So the motions are denied on |
| 25 | that but I'll take it under advisement with respect to count |

**CHARLES RANDALL HARRISON** 

92.   Based upon the above information, it appears the defendant does not have the financial ability to pay a fine. He has outstanding liabilities, primarily attorney fees and medical expenses, and is facing an extensive period of incarceration.

### PART D.  SENTENCING OPTIONS

93.   **Mr. Harrison is charged in Count 2 with Possession With Intent to Distribute Amphetamine in violation of 21 USC 841(b)(1)(D) and (2).   Amphetamine is a Schedule II controlled substance.   Therefore, the defendant should have been charged with a violation of Title 21 USC 841(b)(1)(C).**

Custody

94.   **Statutory Provisions:** Count 1: The maximum term of imprisonment is Life with a 20 year minimum mandatory pursuant to 21 USC 841(b)(1)(A). **(Enhanced Penalty)**

Count 2:   The maximum term of imprisonment is 30 years pursuant to 21 USC 841(b)(1)(C). **(Enhanced Penalty)**

95.   **Guideline Provisions:** Based on a total offense level of 44 (treated as a level 43) and a criminal history category of II, the guideline imprisonment range is Life.

Impact of Plea Agreement

96.   None.

Supervised Release

97.   **Statutory Provisions:** Count 1:  A term of supervised release of at least 10 years is required pursuant to 21 USC 841(b)(1)(A). **(Enhanced Penalty)**

Count 2: A supervised release term of at least six years is required pursuant to 21 USC 841(b)(1)(C). **(Enhanced Penalty)**

98.   **Guideline Provisions:** Count 1:  The guideline range for a term of supervised release is 10 years pursuant to 5D1.2(b). **(Enhanced Penalty)**

Count 2: The guideline range for a term of supervised release is six years pursuant to 5D1.2(b). **(Enhanced Penalty)**

20

(EXH) — T R&R REPLY #9)

(Exhibit D)

REPORT OF DRUG PROPERTY COLLECTED, PURCHASED OR SE...

| 1. HOW OBTAINED (Check) | | | 2a. FILE NO. | 2b. PROGRAM CODE | 3. G-DEF |
|---|---|---|---|---|---|
| ☐ Purchase  ☒ Seizure  ☐ Free Sample. | | | GT-96-0016 | 120 | XAA23 |
| ☐ Lab. Seizure  ☐ Money Flashed  ☐ Compliance Sample (Non-Criminal) | | | | | |
| ☐ Other (Specify) | | | | | |

| 4a. WHERE OBTAINED (City, State/Country) | 4b. DATE OBTAINED | 5. FILE TITLE |
|---|---|---|
| DEFUNIAK SPRINGS, FL | 08/16/96 | OWENS, KEARY |

| 6a. REFERRING AGENCY (Name) | 7. DATE PREPARED | 8. GROUP NO. |
|---|---|---|
| N/A | 08/20/96 | RO |

| 9. Exhibit No. | 10. FDIN (8 characters) | 11. ALLEGED DRUGS | 12. MARKS OR LABELS (Describe fully) | 13. Seized | 14. Submitted | 15. |
|---|---|---|---|---|---|---|
| (a–d) | 96-087341 | Meth | 4 PSEE'S CONTAINING PACKAGES OF BROWN POWDER | | a) 143 grams  b) 15.6 grams  c) 15.20 grams  d) 24 grams | |
| 2 | | Meth | PSEE CONTAINING PLASTIC BAG AND FOIL CONTAINER OF BROWN POWDER | | 31.8 grams | |
| 3 | | METH | PSEE CONTAINING WALLET WITH POWDER RESIDUE | | 206 grams | |

16. WAS ORIGINAL CONTAINER SUBMITTED SEPARATE FROM DRUG?  ☐ NO (Indicated above)  ☒ YES (If Yes, enter exhibit no. and des... original container fully)

REMARKS:
THE ABOVE EXHIBITS WERE SEIZED FROM A 1986 LINCOLN CONT. ON 08/16/96 BY OFFICER BURNHAM. THE EXHIBITS WERE TURNED OVER TO SA GRAVAT AT THE WALTON COUNTY SO. SA GRAVAT MAINTAINED CUSTODY OF EXHIBIT UNTIL IT COULD BE PROCESSED, SEALED AND MAILED TO THE SERL.

| 17. SUBMITTED BY SPECIAL AGENT (Signature) | 18. APPROVED BY (Signature & Title) |
|---|---|
| SA CHARLES J. GRAVAT | JAMES HICKEY LYON |

**LABORATORY EVIDENCE RECEIPT REPORT**

| 19. No. PACKAGES | 20. RECEIVED FROM (Signature & Date) | 21. TITLE |
|---|---|---|
| 6 PSEE | PM 49345534, 8-23-96 | |
| 22. SEAL ☐ Broken ☒ Unbroken | 23. RECEIVED BY (Signature & Date) 8-23-96 | 24. TITLE Evid Tech |

**LABORATORY ANALYSIS/COMPARISON REPORT** 9/14/96

25. ANALYSIS SUMMARY AND REMARKS

Exhibit 1                      Exhibit 2                      Exhibit 3                      9/14/08
Gross: 1479 g                  32.3 g                         208.2 g                        7/4/09
Net: 1247 g                    31.8 g                         residue                        9/14/0

Also found: Exhibit 1: Caffeine and Methyl Sulfone
Note: Exhibits 1, 2, and 3: Original containers from each exhibit submitted for fingerpri
examination.

ccv             *Salt undetermined

| 26. Exhibit No. | 27. No. | 28. ACTIVE DRUG INGREDIENT (Established or Common Name) | WEIGHT PER UNIT ANALYZED | | | 32. TOTAL NET | 33. RES |
|---|---|---|---|---|---|---|---|
| | | | 29. Strength | 30. Measure | 31. Unit | | |
| 1 | 91408 | dl-Amphetamine Hydrochloride | 36.8% | % | MG | 448.9 g | 124 |
| 2 | 91409 | dl-Amphetamine* | | | | | 0.1 |
| 3 | 91410 | No controlled substance detected | | | | | res |

| 34. ANALYST (Signature) | 35. TITLE Forensic Chemist Ivette M. Vallejo | 36. DATE COMPLETE 9/16/96 |
|---|---|---|
| Ivette Maria Vallejo  Sept. 16, 1996 | | |
| 37. APPROVED BY  Thomas J. Janaskey  9/18/96 | 38. TITLE Laboratory Director | 39. LAB. LOCATION Miami, Fl |

DEA Form                                                          1 - Pro...

(EXHIBIT R&R REPLY #11)



**ALABAMA**
**DEPARTMENT OF FORENSIC SCIENCES**

SATELLITE LABORATORY
1478 HARTFORD HIGHWAY
DOTHAN, AL 36301
(334) 712-9742
FACSIMILE (334) 712-1918

MEDICAL EXAMINER
207 NORTH CHERRY STREET
DOTHAN, AL 36303
(334) 793-0615
FACSIMILE (334) 677-0322

CERTIFICATE OF ANALYSIS

Mike Gillis
ABC Board Narcotics Division
P. O. Box 531
Samson, AL   36477

**CASE NUMBER:** 96DD71608 **SUBMITTING AGENCY CASE NUMBER:** 961077L31E

| SUSPECT(S) | RACE | SEX | BIRTH DATE | STATUS |
|---|---|---|---|---|
| Keary Owens | W | M | 09/16/57 | Adult |

**SERVICE REQUESTED:** DRUG ANALYSES

**CHAIN OF CUSTODY:**

| RELINQUISHED BY | RECEIVED BY | DATE | TIME |
|---|---|---|---|
| Mike Gillis | Marc Crews | 08/05/96 | 1320 |

**DESCRIPTION OF EVIDENCE:**

One sealed plastic bag containing one sandwich bag containing
a tan compressed material.

**RESULTS OF ANALYSES:** **DATE(S) OF ANALYSES:** 08/05/96 - 08/22/96

Laboratory analyses of the compressed material revealed the
presence of dl-amphetamine.  dl-amphetamine is a Schedule II
controlled substance.  Weight in grams is 3.135.

Sworn to and subscribed before me this the 22nd day of August,
1996 as a true and correct copy.

Marc Crews
Forensic Scientist II
Analyst

JoAnn Prescott
Notary Public



**ALABAMA**
# DEPARTMENT OF FORENSIC SCIENCES

SATELLITE LABORATORY
1478 HARTFORD HIGHWAY
DOTHAN, AL 36301
(334) 712-9742
FACSIMILE (334) 712-1910

MEDICAL EXAMINER
207 NORTH CHERRY STREET
DOTHAN, AL 36303
(334) 793-0618
FACSIMILE (334) 677-6322

## CERTIFICATE OF ANALYSIS

Mike Gillis
ABC Board Narcotics Division
P. O. Box 531
Samson, AL   36477

**CASE NUMBER: 96DD71607 SUBMITTING AGENCY CASE NUMBER: 961076L31E**

| SUSPECT(S) | RACE | SEX | BIRTH DATE | STATUS |
|---|---|---|---|---|
| Keary Owens | W | M | 09/16/57 | Adult |

SERVICE REQUIRSTED:DRUG ANALYSES

CHAIN OF CUSTODY:

| RELINQUISHED BY | RECEIVED BY | DATE | TIME |
|---|---|---|---|
| Mike Gillis | Marc Crews | 08/05/96 | 1320 |

DESCRIPTION OF EVIDENCE:

One sealed plastic bag containing one plastic "corner" contain-
ing a tan compressed material.

RESULTS OF ANALYSES:   DATE(S) OF ANALYSES: 08/05/96 - 08/20-96

Laboratory analyses of the compressed material revealed the
presence of dl-amphetamine.   dl-amphetamine is a Schedule II
controlled substance.   Weight in grams is 3.388.

Sworn to and subscribed before me this the 22nd day of August,
1996 as a true and correct copy.

Marc Crews
Forensic Scientist II
Analyst

JoAnn Prescott
Notary Public

(EXHIBIT R&R REPLY #10)

1-684-2353     Sep 30 96



**ALABAMA**
## DEPARTMENT OF FORENSIC SCIENCES

SATELLITE LABORATORY          MEDICAL EXAMINER
1470 HARTFORD HIGHWAY        207 NORTH CHERRY STREET
DOTHAN, AL 36301              DOTHAN, AL 36303
(334) 712-9742               (334) 793-0015
FACSIMILE (334) 712-1918     FACSIMILE (334) 677-0322

### CERTIFICATE OF ANALYSIS

Mike Gillis
ABC Board Narcotics Division
P. O. Box 531
Samson, AL   36477

**CASE NUMBER:** 96DD71640 **SUBMITTING AGENCY CASE NUMBER:** 961090L31E

| SUSPECT(S) | RACE | SEX | BIRTH DATE | STATUS |
|---|---|---|---|---|
| Keary Glen Owens | W | M | 08/02/57 | Adult |

**SERVICE REQUESTED:** DRUG ANALYSES

**CHAIN OF CUSTODY:**

| RELINQUISHED BY | RECEIVED BY | DATE | TIME |
|---|---|---|---|
| Mike Gillis | Marc Crews | 08/13/96 | 1300 |

**DESCRIPTION OF EVIDENCE:**

One sealed plastic bag containing one sandwich bag containing
a tan compressed material.

**RESULTS OF ANALYSES:** **DATE(S) OF ANALYSES:** 08/20/96 - 08/22/96

Laboratory analyses of the compressed material revealed the
presence of dl-amphetamine.  dl-amphetamine is a Schedule II
controlled substance.  Weight in grams is 6.342.

Sworn to and subscribed before me this the 22nd day of August,
1996 as a true and correct copy.

Marc Crews
**Marc Crews**
**Forensic Scientist II**
**Analyst**

Jo Ann Prescott
Jo Ann Prescott
Notary Public

$(EXhibit A) E$

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

WITNESS:   CHARLES L. GRAVAT

COPY

RE:   KEARY GLENN OWENS, ET AL

FEDERAL GRAND JURY PROCEEDINGS

APPEARANCE:

ED KNIGHT, Esquire
Assistant U.S. Attorney
Northern District of Florida
114 East Gregory Street
Pensacola, FL   32501

UNITED STATES DISTRICT COURT
U.S. Courthouse
100 North Palafox Street
Pensacola, Florida   32501
September 17, 1996

- - - - - - - - - - - - - - - - - - - - - - - - - - -

Reported By:
Marty Schipper, Court Reporter
P.O. Box 1209
Mossy Head, Florida 32434-1209
(904) 892-3674

FORM C-100 · LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1   Whereupon...

2                    CHARLES L. GRAVAT,

3   was called as a witness and, having been first duly

4   sworn, was examined and testified on his oath, as

5   follows:

6             THE FOREMAN:  You're still under oath.

7             THE WITNESS:  Yes, sir.  How y'all doing.

8                    EXAMINATION

9   BY MR. KNIGHT:

10       Q.   Agent Gravat, you're employed with the DEA?

11       A.   Yes, sir, I still am.

12       Q.   And you are the same agent who presented

13   evidence to this grand jury regarding Mr. Keary Owens

14   and Sonja Williams?

15       A.   Yes, sir.

16       Q.   Now since the time the last indictment was

17   returned against those two, has your investigation led

18   you to believe that others are involved with Mr. Owens

19   in acquiring and distributing methamphetamine?

20       A.   Yes, sir.

21       Q.   And can you describe basically what

22   information you have about Mr. Randy Harrison and Mr.

23   Robert Henley?

24       A.   Yes, sir.  You want me to start?

25       Q.   Uh-huh.

1       A.    Okay.  As y'all remember, back on August

2   16th of this year a vehicle was stopped in DeFuniak

3   Springs, Florida, and Keary Owens and Sonja Williams

4   were arrested with about three pounds of

5   methamphetamine.

6       They were indicted by y'all last month;

7   since that time there's been a lot of follow-up

8   investigation to this and I've got in contact with the

9   law enforcement people in Alabama who were actively

10  working this group at the time, and now what I believe

11  and what I know to be a fact is that there is a group

12  of people in South Alabama who have been acquiring

13  methamphetamine out of California and distributing

14  that methamphetamine in South Alabama and Northwest

15  Florida for the past several years.

16      This three pounds of methamphetamine that

17  was seized in DeFuniak Springs back on the 16th of

18  August was actually going back to Samson, Alabama, the

19  methamphetamine had been acquired in California from a

20  guy named Magdaleno Contreras.

21      I believe he is the source of the

22  methamphetamine in California and that Keary Owens and

23  Charles Randall or Randy Harrison are the main two

24  gentlemen involved in the distribution of the

25  methamphetamine.

1          Robert Henley is the subject who goes to

2     California and picks up the methamphetamine for these

3     two gentlemen and then brings it back into -- actually

4     into South Alabama where it's distributed in South

5     Alabama and in North Florida.

6          The three pounds that were seized on the

7     16th, according to Sonja Williams, who I believe will

8     follow me in here and testify before y'all, had been

9     paid for by Randy Harrison and Keary Owens.

10          Robert Henley had traveled to California,

11     picked up the methamphetamine, had taken a bus back,

12     had been met in Mobile by Sonja and Keary, they had

13     picked up the methamphetamine from him and they were

14     taking it back to Samson where they were to meet with

15     Randy Harrison that same night and split the

16     methamphetamine in half, at which time Keary and Randy

17     would have handled the distribution of the

18     methamphetamine.

19          I know about several other trips that have

20     gone exactly like this from Mrs. Williams, we have

21     other information and other witnesses from the Alabama

22     folks who also helped in the investigation of this

23     involving Mr. Henley and Mr. Harrison's involvement in

24     the trafficking of methamphetamine.

25          Right now I can talk, you know, we think we

1    Alabama.   I served them a grand jury subpoena and they

2    said they'd provide the records to be returned to the

3    grand jury showing this cashier's check had been

4    issued from Keary Owens to this Spring Bay

5    Distributors on August 13th.

6          Q.   So you have the original records in your

7    possession?

8          A.   No, sir, the original records are maintained

9    by the bank; they just provided me a copy.

10         MR. KNIGHT:   Okay.

11         Any other questions of the witness?

12         JUROR:   How much was -- how much was that

13    three pounds; how much is that worth on the street?

14         THE WITNESS:   According to Miss Williams

15    they were paying ten thousand, five hundred a pound

16    for it in California, and probably here locally you

17    figure sixteen ounces to a pound at about fifteen

18    hundred an ounce, so, you know, conservatively you're

19    talking about sixty some thousand dollars' worth of

20    methamphetamine.   There's a lot of money to be made in

21    this.

22         JUROR:   Just for my own curiosity; is that a

23    powder type substance, or what is it?

24         THE WITNESS:   Yes, ma'am; methamphetamine is

25    a hydrochloride, it's like cocaine, it is soluble in

1    water, it's a powder substance that's usually ingested

2    through the nose.

3             It can be mixed with water and diluted and

4    then ingested intravenously with a needle, but the

5    majority of it is ingested through the nose just like

6    cocaine hydrochloride is.

7             It's a very addictive substance, it's

8    long-lasting, becoming more and more popular in

9    Northwest Florida and South Alabama every day.

10            MR. KNIGHT:  Any other questions of the

11   witness?

12            THE FOREMAN:  Thank you.

13            (Witness excused.)

14               - - - - - - - - -

15

16                    CERTIFICATE

17            I hereby certify that the foregoing
     represents a true and correct transcript of the
18   proceedings hereinabove-described.

19            DATED this 26th day of September, 1996.

20   _____
     MARTHA L. SCHIPPER, Court Reporter and
21   Notary Public, State of Florida
     at Large

22

23

24

25

(Exhibit F)                                          293

1   still might have to call you back.  I think that's only
2   happened once in the thirteen years I've been a judge but it
3   could happen, so please give us a phone number.

4       Now, ladies and gentlemen, for the twelve of you
5   remaining, in recognition of the solemn duty we ask you to
6   perform as you now go back to the jury room to deliberate and
7   reach your verdict, I'm going to stand and I ask everyone
8   else in the courtroom to stand with me as the jury retires to
9   the jury room to deliberate and reach a verdict.  Go ahead,
10  we'll send in the exhibits and other materials.

11      (At 3:14 PM the jury left the courtroom.)

12          THE COURT:  Be seated.  All right, we'll be in
13  recess pending a verdict.  We have, I think, another matter
14  involving Mr. Conti to take up.  We'll take about five
15  minutes and do that.  Anything else, counsel, before we
16  recess?  If not, we are in recess.

17  (Recess from 3:15 PM to 4:32 PM.)

18  (Open court.  Defendants present.  Jury not present.)

19          THE COURT:  Well, we have a question from the jury.
20  And let me make sure we've got both defendants and all
21  lawyers.  We do.  The question reads:  "What quantity or drug
22  amount is considered an amount for personal use or
23  possession, or an amount for distribution?"  Let me read it
24  again:  "What quantity or drug amount is considered an amount
25  for personal use or possession, or an amount for

1   distribution."  Mr. Patterson?

2           MR. PATTERSON:  The jury will have to rely on their

3   recollection of the testimony.

4           THE COURT:  Mr. Spurlin?

5           MR. SPURLIN:  Your Honor, I believe the statute has

6   a threshold amount, if I'm not mistaken.

7           THE COURT:  If it does I'm not aware of it.  What is

8   it?

9           MR. SPURLIN:  I thought it was ten grams, Your

10  Honor.

11          THE COURT:  I don't think so.  Mr. Blow?

12          MR. BLOW:  Judge, I think the answer to that

13  question is that's for them to decide.

14          THE COURT:  Well, that's about all I can tell them.

15  So you opt for saying, "That's for you to decide"?  Mr.

16  Patterson, any objection to that?

17          MR. PATTERSON:  No, Your Honor.  I think something

18  from the evidence.

19          THE COURT:  I can say, "There's no legal definition

20  of that and it's a matter of, it's a matter for you to decide

21  from the evidence."  Is that all right?

22          MR. PATTERSON:  Yes, sir.

23          MR. SPURLIN:  Yes, sir.

24          THE COURT:  All right, here's the response:  "There

25  is no legal definition, and it is a matter for you to decide

COPY (Exhibit B)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

WITNESS:   CHARLES L. GRAVAT

COPY

RE:   KEARY GLENN OWENS, et al

FEDERAL GRAND JURY PROCEEDINGS

APPEARANCE:

ED KNIGHT, Esquire
Assistant U.S. Attorney
Northern District of Florida
114 East Gregory Street
Pensacola, FL  32501


UNITED STATES DISTRICT COURT
U.S. Courthouse
100 North Palafox Street
Pensacola, Florida  32501
August 20, 1996

- - - - - - - - - - - - - - - - - - - - - - - - -

Reported By:
Marty Schipper, Court Reporter
P.O. Box 1209
Mossy Head, Florida 32434-1209
(904) 892-3674

FORM C-100 - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313



1    Whereupon...

2                    CHARLES L. GRAVAT,

3    was called as a witness and, having been first duly

4    sworn, was examined and testified on his oath, as

5    follows:

6              THE FOREMAN:  State your name and spell it

7    please for the record.

8              THE WITNESS:  Yes, sir.  My name is Charles

9    L. Gravat; it's G-r-a-v-a-t.

10                        EXAMINATION

11   BY MR. KNIGHT:

12        Q.   Okay.  Mr. Gravat; you're an agent with the

13   Drug Enforcement Administration?

14        A.   Yes, sir, I am.

15        Q.   And in connection with your duties with that

16   agency have you become familiar with Keary Glenn Owens

17   and Sonya Melissa Williams?

18        A.   Yes, sir.

19        Q.   And is Ms. Williams known by any other name?

20        A.   Several.

21        Q.   And is she also known as Sonja Morgan?

22        A.   Right.

23        Q.   Okay.  If you would describe for the grand

24   jury how you became familiar with both of them.

25        A.   I received a call last Friday night from the

1   Walton County Sheriff's Department that they had

2   stopped these two individuals in a vehicle and seized

3   what they believed was a quantity of methamphetamine.

4            I then went to Walton County where I

5   contacted investigator Lorenz (phonetic) and Officer

6   Burnham (phonetic) from the DeFuniak Springs Police

7   Department and was advised that they had just made a

8   traffic stop in downtown DeFuniak Springs and stopped

9   Keary Owens and Sonja Williams in a 1986 Lincoln

10  Continental, and during the search of the vehicle

11  approximately three pounds of methamphetamine were

12  discovered in the vehicle along with about twenty

13  thousand dollars in cash, and a .9-millimeter handgun

14  in a concealed compartment in the door panel on the

15  passenger's side of the vehicle.

16       Q.   Okay.   Now, can you describe where the

17  methamphetamine was in relation to the car and both

18  Mr. Owens and Ms. Williams?

19       A.   Yes, sir.   They were the driver and

20  passenger, the front seat occupants of the vehicle.

21  The methamphetamine was on the floorboard of the

22  driver's seat in large taped packages basically under

23  the -- under where Mr. Owens would sitting.

24            There were small amounts of methamphetamine,

25  methamphetamine residue found in Ms. Williams' purse

1    in an envelope that had about ten thousand of the

2    twenty thousand dollars, and under the vehicle where

3    we believe Mr. Owens dropped some when he got out to

4    check his tail light, which was actually the reason

5    for the initial stop --

6        Q.   Okay.  All right.

7        A.   -- a small bag of meth was found under the

8    car.

9        Q.   All right.  The indictment, the proposed

10   indictment charges both of these individuals with a

11   conspiracy that began on or about January 1st of 1994?

12       A.   Yes, sir.

13       Q.   Can you describe for the grand jury what the

14   basis of the conspiracy charge is?

15       A.   Yes, sir.  I knew these people were under

16   investigation by DEA in Mobile so I contacted the DEA

17   task force in Mobile and talked to Agent Claude Cosey

18   (phonetic) and to Agent Linda Clements (phonetic), and

19   was advised that they were conducting an investigation

20   into Mr. Owens and Ms. Williams dating back several

21   years.

22            They advised that they had interviewed

23   witnesses who had told them about the methamphetamine

24   trafficking of both Owens and Williams during this

25   time frame, that the methamphetamine laboratory that I

1    did on a search warrant in Walton County back in

2    October of '95, they prosecuted a gentleman named

3    Michael Aukman (phonetic) in the Middle District of

4    Alabama but the laboratory was here in north Florida,

5    and Aukman has told them in subsequent interviews,

6    he's now cooperating, that the majority of the

7    methamphetamine that he was manufacturing in his

8    laboratory was being distributed by Keary Owens.

9             He also told them that since late 1993,

10   early '94, he had been traveling to California to pick

11   up larger quantities of methamphetamine and bringing

12   it back to North Florida, South Alabama for

13   distribution, and that Mr. Owens was involved, was the

14   main one involved in distribution of the

15   methamphetamine that Aukman was acquiring.

16             I was also advised that in the last ninety

17   days they have made three purchases of methamphetamine

18   from Mr. Owens and in every occasion Ms. Williams was

19   present in the vehicle when they came and delivered

20   the methamphetamine, and they have several witnesses

21   who would testify that Mr. Owens routinely carried a

22   firearm, not only in his drug trafficking but in his

23   daily life that he was always armed for his protection

24   and his drug trafficking.

25             Q.   Was the firearm that was found in the car

1    loaded?

2        A.    Yes, sir; there was one in the chamber and

3    the handle was cocked, according to the police

4    officer.

5        Q.    And that was a .9-millimeter pistol?

6        A.    Yes, sir.    We don't know what brand, we

7    think it's a Russian .9-millimeter, because the serial

8    number had been altered and we're trying to identify

9    that right now.

10        Q.    Okay.    Now after both Mr. Owens and Ms.

11    Williams were taken into custody last Friday, was

12    another search warrant executed at his residence?

13        A.    Yes, sir, at the residence of Mr. Owens,

14    yesterday morning again DEA in Mobile, Alabama,

15    executed a search warrant at Mr. Owens's residence up

16    in Samson, Alabama, and discovered all the chemicals

17    and glassware used in the manufacture of

18    methamphetamine, they discovered some money transfers

19    used to transfer money from Alabama to California

20    where they believe he was purchasing the

21    methamphetamine; also found a note from Ms. Williams

22    to Mr. Owens telling him, you know, "If you're going

23    out of town make sure you leave me some stuff to sell,

24    some methamphetamine to distribute."

25        Q.    Okay.    Have other witnesses indicated that

1   Mr. Owens was involved in cooking or manufacturing

2   methamphetamine at that residence you described?

3        A.   Yes, sir.  We had at least one witness who

4   told agents about that Mr. Owens and Mr. Aukman were

5   trying to cook last I think September '95 and they had

6   a fire in Mr. Owens' residence where they trying to

7   cook some methamphetamine, basically some chemical

8   explosion, which is common in the clandestine

9   manufacture of methamphetamine.

10       Q.   Okay.  And I think you had indicated that

11  the date that Mr. Owens and Ms. Williams were stopped

12  was August 16th of 1996?

13       A.   Yes, sir; last Friday night, August 16th,

14  1996.

15       Q.   Can you describe with any more particularity

16  what Ms. Williams, what her involvement is with Mr.

17  Mr. Owens?

18       A.   They're boyfriend/girlfriend, number one,

19  they are now, I think at the time they were not.  The

20  information from our witnesses is she's involved in

21  helping Mr. Owens in the distribution of

22  methamphetamine.

23       Q.   Okay.  Was her purse searched at the time of

24  the stop?

25       A.   Yes, sir.

8

1       Q.   Was any methamphetamine discovered in the

2    purse?

3       A.   Yes, sir; residue was discovered in the

4    purse.

5       Q.   Okay.   And I think you had indicated some

6    quantity of cash was recovered.  How much was that?

7       A.   Almost twenty, like nineteen thousand, eight

8    hundred and fifty-one dollars, the exact figure I

9    don't remember, but it was a little less than twenty

10   thousand dollars in cash was in the vehicle.

11      Q.   And you've indicated that approximately

12   three pounds of methamphetamine was recovered?

13      A.   Yes, sir; it weighed out over fifteen

14   hundred grams in the taped packages, subtracting for

15   the wrappers, we have not removed them because we

16   don't want to mess up the fingerprints so we sent them

17   to the lab in their entireties and let the lab do it

18   in a more structured environment where we don't risk,

19   you know, maybe contaminated fingerprints, so we don't

20   know the exact weight of the methamphetamine, but the

21   total packages was over fifteen hundred grams, which

22   is way over three pounds.

23      Q.   And what would -- on like street value, what

24   would they be able to sell a pound of methamphetamine

25   for?

1          A.    Twelve to fifteen thousand dollars.

2                MR. KNIGHT:  Okay.  Any questions?

3                JUROR:  I have one.

4                THE WITNESS:  Yes, sir.

5                JUROR:  This Williams; you said that when

6     you opened the purse you had residue of

7     methamphetamine?

8                THE WITNESS:  Yes, sir.

9                JUROR:  Could that be prescription drugs or

10    --

11               THE WITNESS:  No, sir; methamphetamine is

12    not made legally anywhere to my knowledge; it is a

13    clandestine manufactured illegal drug.

14               JUROR:  But you said one time they were

15    boyfriend/girlfriend.  I just wanted to make sure it

16    was actual drugs.

17               THE WITNESS:  I mean it hasn't had a lab

18    report, you know, from what I looked at and what it

19    smelled like, you know, it looked like residue of

20    methamphetamine, the powder residue in her purse

21    appeared to be methamphetamine.

22               Now there's no legal use of methamphetamine

23    I'm aware of in this country.

24               JUROR:  Okay.  I just wanted to make sure it

25    wasn't a prescription drug or something where they had

1    --

2              THE WITNESS:  No, sir.

3              JUROR:  Because you said they were still

4    boyfriend and girlfriend, that she wasn't, you know,

5    just --

6              THE WITNESS:   No, sir; she was actually

7    arrested in June of '95 by the Geneva County Sheriff's

8    Office for possession of methamphetamine.

9              JUROR:  Okay.

10             MR. KNIGHT:   Not that that has anything to

11   do with the charges that we're discussing here.

12             THE WITNESS:  Well, it does; it's part of

13   the conspiracy.  It's within the time frame so it is a

14   conspiratorial act.

15   BY MR. KNIGHT:

16        Q.   Yeah, but with respect to the possession?

17        A.   Right.

18        Q.   What we're talking about, what was found in

19   the purse, it's not any type of capsule or pill form?

20        A.   No; it's looks like maybe she had a bag of

21   methamphetamine and maybe some had fallen out or

22   something.

23             JUROR:  It wasn't BC powder.

24             THE WITNESS:  No, sir, I don't think so.  I

25   have sent it to the lab to get them to test it to make

1    sure but I don't believe it was BC Powders.

2          JUROR:  She was also in possession of the

3    cash, too, wasn't she?

4          THE WITNESS:  Yes, sir.

5    BY MR. KNIGHT:

6          Q.  And you've indicated the gun was found on

7    the passenger's side of the car?

8          A.  Right, right by where she was.

9          Q.  Okay.  But you don't have any other

10   indication -- I mean the proposed indictment charges

11   him alone with using or carrying the gun during the

12   commission of --

13         A.  No, sir.  All the information from the

14   witness is that he routinely carried the gun, and that

15   also we believe that we can tie this particular gun to

16   him through the box that was found at his residence in

17   our search yesterday,  but we have no information to

18   tie her to the gun at this time.

19         Q.  Okay.  And so for that reason she's not

20   charged with the use or carrying the gun?

21         A.  That's correct.

22         JUROR:  Even though it was on her side of

23   the car?

24         THE WITNESS:  Without a witness that ties

25   her into it, I'd hate, you know, to charge her without

1   being able to prove it, so if we develop that

2   information we'll bring it back and supersede but

3   right now we just -- we don't have enough to put the

4   -- you know, enough to ask for that particular

5   charge.

6   BY MR. KNIGHT:

7       Q.   The gun was concealed, was it not?

8       A.   Yes, sir.

9       Q.   Okay.  So you have no indication that she

10  was even aware that it was there?

11      A.   I'm sure she was aware it was there but I'm

12  just saying that we don't have any -- you know, that's

13  just my opinion but I have no --

14           JUROR:  Well, have you checked it for

15  fingerprints.

16           THE WITNESS:  Yes, sir; we're going to check

17  it for fingerprints, but it's only been since last

18  Friday so we have not had time to get all that

19  stuff done, but yes, sir, but if that -- if there are

20  -- you know, if it comes back we will.

21           JUROR:  What; you're not bringing us all the

22  information.  You haven't had time.  I was just being

23  facetious.

24           MR. KNIGHT:  Any other questions?

25           THE WITNESS:  Thank y'all.

1          THE FOREMAN:     Thank you.

2              (Witness excused.)

3                  - - - - - - - -

4

5                      CERTIFICATE

6          I hereby certify that the foregoing
represents a true and correct transcript of the
7      proceedings hereinabove-described.

8          DATED this 4th day of September, 1996.

9

10         MARTHA L. SCHIPPER, Court Reporter and
           Notary Public, State of Florida

11

12,

13

14

15

16

17

18

19

20

21

22

23

24

25